IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2014 Session

## STATE OF TENNESSEE v. KEVIN LAMONT FRENCH

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2466      Steve R. Dozier, Judge**

**No. M2013-01270-CCA-R3-CD - Filed July 16, 2014**

Appellant, Kevin Lamont French, was convicted by a Davidson County jury of premeditated murder, felony murder, and especially aggravated robbery. He received life sentences for the murder convictions, and the trial court sentenced him to a concurrent sentence of twenty-one years for his especially aggravated robbery conviction. On appeal, he argues that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred by admitting prior bad act testimony; (3) the trial court erred by admitting a letter purportedly written by appellant; (4) the trial court erred by admitting testimony regarding weapons found in appellant's home; (5) the assistant district attorney general committed prosecutorial misconduct during closing arguments; and (6) the trial court erred by admitting certain autopsy photographs.[1] Following our review of the record, the arguments of the parties, and the applicable law, we affirm the judgments of the trial court but remand the case for the trial court to merge the two murder convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Robert L. Sirianni, Jr. (on appeal), Winter Park, Florida; and Robert T. Vaughn (at trial), Nashville, Tennessee, for the appellant, Kevin Lamont French.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Michelle Consiglio-Young, Assistant Attorney General; Victor S. Johnson, III, District

---

[1] Appellant presented a seventh issue — ineffective assistance of counsel — in his brief but abandoned the issue during the oral argument in this matter.

Attorney General; and Wesley King and Jennifer Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

I. Facts

This case concerns the November 16, 2008 especially aggravated robbery and murder of Andre Veals. Appellant and Leangelo L. Ramey were indicted by a Davidson County grand jury on September 10, 2010, for premeditated murder, felony murder, and especially aggravated robbery.[2] The parties presented the following evidence at appellant's September 2012 trial.

Metro Nashville Police Officer Adam Weeks testified that on November 16, 2008, he was dispatched "just before 3:00 p.m." to a shooting in progress at Carl's Car Wash on Gallatin Pike in Davidson County. He found the victim lying on the ground. Medical personnel arrived shortly thereafter. Officer Weeks secured the crime scene and began logging potential witnesses and other responding officers. In a photograph of the crime scene, Officer Weeks identified appellant's brother, Jonathan French, who was standing outside the crime scene tape talking to an investigator. He also identified several photographs of a tan Chevrolet Trailblazer registered to the French family, which was parked beside the car wash.

Kimberly McLemore testified that she was vacuuming her car's interior at the car wash that day, and she observed a young man — the victim — walk by her car, talking on a cellular telephone. She then saw a car "that still had soap all over it" drive out of a wash bay. The car was "four door, metallic blue[,] . . . set up high on tires and r[i]ms." The car stopped by the victim, and the driver opened his door. Ms. McLemore said that the victim and the driver conversed but that she could not hear their words over the vacuum cleaner. She continued to vacuum but also looked toward the two men occasionally because they were near sports equipment that she had placed on the ground. Ms. McLemore testified that she then heard three gun shots and that she dived into her car. She heard "tires screeching" and saw the victim "staggering . . . like he was trying to walk away." Ms. McLemore said that she "was screaming" and "was frantic." She saw the victim "drop[] to his knees." She said that the blue car tried to run over the victim, "but they couldn't, so the tires were spinning out." She continued, "And as the tires continued to spin as they were trying to go forward, they just ran over him." Ms. McLemore testified that she did not know who fired the shots. She described the driver of the blue car as "a black male" wearing "a black stocking cap."

---

[2] Appellant and Ramey were tried separately.

Ms. McLemore said that she was "[v]ery close" to the gunfire and that there was a bullet hole in her car from the incident.

Ms. McLemore further testified that on November 20, 2008, she met with Detective Paul Harris to attempt to identify someone involved in the shooting. She said that in a photographic lineup, she circled "the gentleman . . . [who] looked familiar to me, [who] was driving the blue car." Ms. McLemore agreed that she told Detective Harris, "'100 percent sure, no, but I do believe that's the guy I saw.'" She testified that she had been watching both the driver of the blue car and the victim because she "didn't know if these guys were going to steal [her softball equipment] or what, so [she was] constantly looking out of [her] car to make sure . . . that they [didn't] get [her] stuff" and that "some people you just don't forget."

Terry Eubanks testified that on November 16, 2008, he was visiting friends approximately one block from the car wash where the victim died. He recalled seeing a car driving down the street that "had soap suds all over it." Soon thereafter, he saw the same car driving the opposite direction, back to the car wash. Mr. Eubanks described the car as "a Ford, blue with big black r[i]ms on it." He said that he could not see who was inside the car because the windows were tinted. Shortly after seeing the car for the second time, Mr. Eubanks said that he heard "several shots, then the car came flying back down the street."

Ivory Kelly testified that he was at the car wash when the victim was murdered. Mr. Kelly said that he was behind the wash bays drying off his car when he saw a blue car pull into a wash bay. A young man, the victim, exited the car and began to wash it. Mr. Kelly then saw "a gold SUV" pull into the car wash parking lot. Two men exited the gold SUV and approached the victim. They spoke, but Mr. Kelly could not hear what was said. He said that it appeared like the men knew each other. Mr. Kelly then saw the blue car back out of the wash bay. He testified that one of the men from the SUV was driving the blue car at that point. The other man from the SUV was left at the car wash and was wearing "a Jamaican cap." Mr. Kelly saw the victim walking across the street, talking on his cellular telephone. The man wearing the Jamaican cap sat in the SUV for a minute and might have been on his telephone. Mr. Kelly said that a few minutes later, the blue car returned and pulled into the wash bay where it had been before. Then, the car backed out and pulled inside another bay. At that point, Mr. Kelly heard two gunshots. Mr. Kelly testified that he saw the blue car "coming out of the stall" and saw "a body rolling up under the car." Then, the second man from the SUV approached Mr. Kelly, so he "jumped in [his] car," drove to AutoZone, and called 9-1-1. Mr. Kelly testified that he tried to identify the men from the SUV in a photographic lineup but was unsuccessful because he did not see their faces well.

On cross-examination, Mr. Kelly admitted that he did not actually see the two men exiting the SUV but that he assumed they had done so. He said that he knew only one person was in the blue car because he could see through the windshield despite the windows being tinted.

Christopher Savage testified that he was acquainted with appellant and had been "real [sic] good friends" with the victim. Mr. Savage testified that both appellant and the victim had dated a woman named Amanda Crawford. Mr. Savage recalled being at a friend's party on October 25, 2008, which appellant, the victim, and Amanda Crawford also attended. Mr. Savage testified that he witnessed "an altercation in the street between" appellant and the victim. He explained, "[Appellant] . . . attempted to walk towards [the victim] with a gun in his hand." Mr. Savage said that appellant appeared angry and that he believed appellant would have attempted to shoot the victim if Ms. Crawford and appellant's brother had not stopped him. According to Mr. Savage, he could not hear anything said by either appellant or the victim, but the area was well-lit. He said that appellant's gun was "black and gray" and was either a .380 caliber or 9mm. Mr. Savage testified that after Ms. Crawford and appellant's brother broke up the altercation, Ms. Crawford and appellant walked back to the house, and the victim stayed by his vehicle.

On cross-examination, Mr. Savage said that when Ms. Crawford was breaking up the altercation, she asked appellant what he was doing and that appellant replied, "'[O]h, so you fixing [sic] to save him[;] you [sic] taking up for him . . . .'" Mr. Savage said that he tried to make peace between appellant and the victim afterwards, but no one said anything. They went their separate ways at that point. Mr. Savage testified that the victim typically drove a maroon Caprice but also owned a blue Crown Victoria.

Metro Nashville Police Department ("MNPD") Lieutenant Frank Ragains investigated the crime scene in this case. He testified that there were blood drops on Ms. McLemore's car and that a blood trail led from her car through a car wash bay to the victim's body. There were also drag or burn marks that showed where the victim "had been hit and was carried by a vehicle." The State admitted photographs of the crime scene and the crime scene diagram through Lieutenant Ragains' testimony. On cross-examination, Lieutenant Ragains testified that he recovered two spent 9mm casings and one live 9mm round from the scene.

Lynn Mace, a crime scene investigator for the MNPD, testified that she processed the gold/tan Trailblazer found at the crime scene for evidence. She lifted fingerprints, which were compared by another individual, and she collected papers that had appellant's name on them, including a pay stub and a social security card. She did not recall finding any papers

bearing the names Eric French, Jonathan French,[3] or Leangelo Ramey. Felicia Evans, also a crime scene investigator, testified that she attempted to lift fingerprints from the shell casings found at the scene but was not successful. MNPD fingerprint examiner Larry Farnow testified that he compared fingerprints collected from the tan Trailblazer with known fingerprints of appellant and Leangelo Ramey. The fingerprints matched those of appellant.

Tennessee State Trooper Kasey Fitts testified that in November 2008, he was employed by the Millersville Police Department. In that capacity, he was dispatched to a vehicle fire on I-65 North near mile marker 100 on November 16, 2008. He arrived at 8:07 p.m. and observed a Ford Crown Victoria "fully engulfed in flames." He ran the vehicle tag number and learned that the vehicle had been listed as stolen. The fire department extinguished the fire, and the vehicle was towed away.

Retired MNPD Detective Johnny Lawrence testified that he processed the victim's "burned out vehicle" for evidence. He collected fingerprints, "but they were not good quality." He also swabbed the door handles for DNA evidence. Detective Lawrence said that he "[c]ollected some possible human tissue . . . from the right rear wheel area." He also found blood on the underside of the vehicle.

MNPD Detective Warren Fleak testified that he executed a search warrant at a residence on East Marthona Road that was associated with appellant. He recovered a non-functional Larsen .380 semi-automatic pistol, a Colt Cobra .38 special revolver, and a Glynnfield model 778 12-gauge shotgun from the residence. The .38 special and the shotgun were both loaded. Detective Fleak also recovered additional ammunition: .38 special rounds, 12-gauge rounds, and .32 auto rounds.

Tennessee Bureau of Investigation ("TBI") Special Agent and forensic scientist Shelly Betts testified as an expert in firearms and toolmark identification. She compared the fired bullets from the crime scene with firearm evidence recovered from East Marthona Road and Banberry Drive (residence of co-defendant Ramey's mother). She said that the 9mm ammunition collected from Banberry Drive were from a different manufacturer than the ammunition recovered at the crime scene and that the one fired cartridge case from Banberry Drive did not have the same markings as ammunition from the crime scene. Agent Betts also said that the fired cartridge cases from the crime scene had not been fired from any of the firearms collected at East Marthona Road. Agent Betts testified that the 9mm cartridge cases found at the crime scene had been fired from the same weapon and that "the markings that were found on those cartridge cases are typical of what we see when a cartridge is fired in

---

[3] The record indicates that Jonathan French is also known as Eric French.

a Highpoint firearm." The unfired 9mm cartridge from the crime scene was from the same manufacturer and was the same type as the fired cartridges from the crime scene.

MNPD Officer William Stewart testified that he spoke to appellant at the crime scene on November 16, 2008. Officer Stewart said that appellant approached him to ask when he would be able to recover his mother's car, which was inside the crime scene. Appellant also told Officer Stewart that he knew the victim and that the victim's car was across the street. However, the car to which appellant pointed was not a blue Crown Victoria. Officer Stewart could not recall the make and model of that car.

On cross-examination, Officer Stewart said that he spoke with the people inside the car to which appellant had pointed, whom he learned were the victim's mother and girlfriend. They showed him paperwork indicating that the car was owned by the victim. Officer Stewart agreed that the car might have been a burgundy Caprice.

MNPD Detective Curtis Hafley testified that he was dispatched to the crime scene on November 16, 2008. Subsequently, he went to the residence of appellant's parents on Forrest Avenue to ascertain the location of a Chevrolet Suburban. He explained that he "was just going simply to find" the vehicle and that he had no other information about it. While at the residence, Detective Hafley spoke with appellant's parents. They called appellant, and Detective Hafley spoke with appellant by telephone. Detective Hafley returned to the scene and spoke with appellant in person at the parking lot across the street from the car wash. Appellant told Detective Hafley that he had driven the Trailblazer earlier that day but that he had exchanged vehicles with his brother because his brother had planned to wash the Trailblazer. Appellant said that the vehicle exchange took place on Andy Street, at a house where appellant was going to have his hair styled. Appellant further stated that after he left the house on Andy Street, he received a telephone call about the Trailblazer. Detective Hafley said that he found it unusual that appellant was not wearing a jacket that day because "[i]t was the coldest day of the year." He also recalled commenting to appellant that appellant had not stayed to get his hair styled "because his hair was not freshly fixed." Detective Hafley said that the Trailblazer did not appear to have been recently washed.

MNPD Detective Paul Harris testified that he was the lead investigator in this case. He said that while he was at the crime scene, he was told that a 9-1-1 caller had "notified dispatch that the persons responsible for this had arrived in a gold Chevy [T]railblazer." He also testified that the victim had called 9-1-1 himself. The following day, the victim's car was discovered by the Millersville Police Department, and Detective Harris had the vehicle brought to Nashville. Detective Harris testified that during the course of his investigation, he developed appellant as a suspect. He said that he showed a photographic lineup to Ms. McLemore, who identified appellant's photograph.

Detective Harris interviewed appellant on November 25, 2008, outside of the East Marthona residence. Appellant told him that on the day of the victim's murder, he had driven his brother's Expedition because his brother had taken the Trailblazer that appellant typically drove. Appellant did not mention a vehicle exchange. Appellant also said that he had gotten his hair braided at a location on Riverside Drive. While at the Riverside Drive location, appellant said that he received a call from James Crawford on a friend's telephone informing him that his Trailblazer was inside a crime scene. Appellant explained that he had left his cellular telephone at his Forrest Avenue house and that his telephone was in the same place when he returned home as it was when he left. He told Detective Harris that he spoke with his brother, Jonathan French, once on November 16, while Jonathan French was driving to a restaurant. Appellant said that the last time he had seen the victim was at James Crawford's birthday party and that appellant had an altercation with Christopher Savage at the party. Appellant denied having a gun at Mr. Crawford's party and said that he did not "own a gun . . . [had] never even touched a gun in his life."

Detective Harris testified that he interviewed appellant again at the East Marthona address on May 19, 2009. Sergeant Postiglion was also there and did the majority of the questioning. In that interview, appellant was asked whether anyone had borrowed his cellular telephone on the day of the murder, and appellant responded that no one else used his telephone. The recording of the May 19 interview was played for the jury. In the recording, the police officers told appellant that his cellular telephone "ping[ed] off a tower" in Millersville, where the victim's car was found. Detective Harris testified that the police had obtained appellant's cellular telephone records via a subpoena, and the State introduced those records, along with the telephone records of the victim, Amanda Crawford, and Jonathan French, into evidence.

On cross-examination, Detective Harris testified that the police searched two locations associated with co-defendant Leangelo Ramey, one of which was Banberry Drive, where the police found twenty 9mm live rounds and one 9mm cartridge casing. Regarding the weapons found at appellant's East Marthona residence, Detective Harris testified that he knew before the search that weapons would be in the house and that he had been told by numerous people that appellant was "frequently armed and carrie[d] firearms." However, he agreed that the weapons found at East Marthona were not registered to a particular person.

On re-direct examination, Detective Harris recalled that Amanda Crawford told him that appellant pulled a gun on the victim at James Crawford's party. He could not remember whether James Crawford and Christopher Savage had also seen the gun. Regarding the victim's 9-1-1 call, Detective Harris testified that he obtained a recording of the call by recording it himself while the communication center played their recording for him over the telephone.

-7-

On recross-examination, Detective Harris agreed that the victim told the 9-1-1 dispatcher, "'[S]omebody just stole my car and robbed me at gun point.'" He further agreed that the victim gave "additional address and car information," then said, "'[H]old on, now he [sic] pulling back in the parking lot[;] they [sic] playing with me, man, just send the police.'" Finally, Detective Harris agreed that the victim did not mention the name of the person who had taken his car.

TBI Agent Michael Frizzell testified as an expert in the field of communication records in criminal investigations. He explained that "pinging" means that a cellular telephone registers with a network by transmitting a paging signal to the network so that the network knows the location of the telephone. This information allows the network to use the cellular site closest to the telephone to communicate with that telephone. Agent Frizzell said that a cellular telephone will ping if, for example, a call is made or received, a text message is sent or received, or if a smartphone application updates itself. However, sometimes the networks will "load shift[]" during high-volume periods by sending the signal to the next-closest tower. Agent Frizzell testified that he reviewed telephone records associated with appellant, Amanda Crawford, and Jonathan French and prepared a synopsis of the calls between appellant's telephone and the other two. In particular, the State pointed out calls from appellant to Amanda Crawford at 12:59 p.m. and 10:17 p.m., calls from appellant to Jonathan French at 2:22 p.m. and 5:19 p.m., and calls from Jonathan French to appellant at 10:46 a.m. and 2:16 p.m. On cross-examination, Agent Frizzell admitted that he did not know who had possession of appellant's telephone on the day of the murder. He acknowledged that appellant's telephone records indicated that his telephone called numbers that later testimony showed belonged to Montez Jennings and Mr. Jennings' girlfriend.

David Kline, an employee with the Metropolitan Planning Department's mapping division, testified that he prepared several maps for the State showing locations of interest in this case. In particular, he plotted on a map the locations of Carl's Car Wash, the victim's burning car, and cellular towers pinged by appellant's telephone. He said that he plotted the cellular towers based on appellant's telephone records and information in a database regarding the location of cellular towers. According to the information he received, appellant's cellular telephone pinged a tower near where the victim's burning car was found at the following times: 5:42:01 p.m.; 8:03:22 p.m., 8:10:34 p.m., and 8:11:36 p.m. Mr. Kline also plotted the towers pinged by Jonathan French's telephone. Jonathan French's telephone pinged the tower near where the victim's burning car was found at the following times: 5:53:02 p.m., 5:53:28 p.m.; 5:55:15 p.m.; 5:58:55 p.m.; and 5:59:29 p.m.

Montez Jennings testified that he had known co-defendant Leangelo Ramey since he was ten or eleven years old and that he did not know appellant. Mr. Jennings said that Ramey told him "that he robbed a guy, he shot him[,] and he ran him over[,] and he burned

his car." Mr. Jennings testified that Ramey also showed him a weapon, which he described as a smaller caliber, all-black gun. He believed it "was like a .9 millimeter or something." He said that around the time of the victim's murder, Ramey had shoulder-length dreadlocks and drove a white Dodge Dynasty.

On cross-examination, Mr. Jennings said that Ramey came to his apartment the day after the victim's murder. Ramey "told [him] about the incident at the car wash" and showed him a weapon. After that conversation, Mr. Jennings made him leave the apartment. While they were outside of the apartment, Ramey repeated his story. Mr. Jennings had no contact with Ramey after that day except for seeing him briefly at a shopping mall. Mr. Jennings said that he was not afraid of Ramey but "was scared of the whole situation." He said, "[A]ll I know is that he told me that he killed someone." He stated that Ramey had been "kind of . . . crazy" when they were growing up and that he had "[m]ood swings and . . . real erratic behavior." He had never known Ramey to carry weapons, however. Mr. Jennings did not recall whether Ramey called him the night of November 16, 2008, but he acknowledged that the records shown to him by defense counsel displayed calls to his telephone number and to his girlfriend's telephone number.

Keyosha Blair testified that she had a son with appellant. She stated that she did not know appellant in November 2008 and that they met sometime in 2009. She said that after he was incarcerated, they continued to communicate, mostly about their child. Ms. Blair testified that appellant asked her "to say that he was with [her] at the time" of the victim's murder, despite her not having met him yet. Ms. Blair identified a letter that she said appellant sent her from jail in which appellant told her to say that she was with him while he was getting his hair braided and that he picked her up in an Expedition.

TBI Special Agent Jennifer Shipman analyzed several exhibits in this case for DNA. She testified that the four swabs from underneath the victim's car were positive for the presence of blood. Further testing of one of the swabs revealed DNA that matched the victim's DNA.

Leangelo Ramey, appellant's co-defendant, testified as a witness for the State. He said that he had known appellant for more than a year prior to the victim's murder. He described appellant as a friend and said that appellant helped him find work. Ramey testified that he spent the night on November 15-16, 2008, at appellant's house, which was located on a street beginning with the letter "M" in the Madison area. Ramey said that appellant picked him up on November 15 in a brown, four-door sedan.

Ramey said that the next day, he asked appellant for a ride to a friend's house. Ramey said that they left appellant's house in appellant's Trailblazer. Instead of taking Ramey to

his friend's house, however, appellant stopped at a car wash off Gallatin Pike. Ramey testified that appellant parked next to the car wash, not inside one of the wash bays, and left the vehicle. Ramey said that appellant did not tell him why they had stopped. He waited for appellant to return, but after "a little while," he got out of the vehicle to look for appellant. Ramey said that he first went to the back of the car wash and then to the front. He did not see appellant at first. Instead, he saw a blue car pass him that had "a lot of soap on it." He testified that he could not tell who was driving the blue car. Fifteen to twenty seconds later, he heard two gunshots and then "a big vroom . . . like just a loud roar of a car." Ramey said that he started moving toward the back of the car wash when he saw "the vehicle and [saw] a body rolling from . . . up under the vehicle coming [his] way full speed." Ramey testified that he saw appellant in the driver's seat. Appellant drove away from the car wash "up towards Dozier." Ramey said that at that point, he was in "a state of panic," so he walked away from the car wash and went to his friend's house.

Ramey testified that he stayed at his friend's house for a time, then he called appellant from his friend's telephone to ask for a ride home. Appellant told him "that he would get in touch with [Ramey] when . . . he [got] a chance." Ramey explained that he called appellant because he was the only person who would give him a ride. When appellant picked him up, appellant was driving the brown sedan he had driven the previous day. On the way to the home of Ramey's girlfriend, appellant gave Ramey a cellular telephone that Ramey assumed was his.

Later, appellant called Ramey on that telephone from a number Ramey believed was that of appellant's brother. In that conversation, appellant asked Ramey to do something for him but did not elaborate. Ramey drove his own car to appellant's house in the Madison area. When he arrived, appellant told him "to go pick up the car" at a particular apartment complex. Ramey explained that "the car" was "the blue car from the car wash." Ramey found the blue car and began driving it towards where appellant wanted him to go, but he got lost. He called appellant, who told him that he would "be there in a minute." Appellant arrived and gave him directions to the interstate. Ramey said that he drove onto the interstate and headed away from Nashville. Ramey testified that he called appellant "a couple of times" to tell appellant that he did not know where he was going. Appellant told him, "'[J]ust drive[.]'" Eventually, Ramey pulled over to the side of the road, and appellant came to pick him up. At that point, appellant was driving a white SUV that Ramey believed belonged to appellant's brother. Appellant took Ramey back to Ramey's car. Ramey testified, "[T]hat's the time when he told me I need to get rid of the car." Ramey said that appellant specifically told him to burn the car. After appellant dropped him off at his car, Ramey obtained a gasoline can and gasoline, then drove back to the blue car. He poured the gasoline in the car and lit it on fire. Ramey said that he drove away but had to call appellant several times for directions. He met appellant to return appellant's telephone.

Ramey testified that he continued to spend time with appellant after November 16 but not as often. Ramey recalled that appellant asked him not to tell anyone anything. Every time he saw appellant thereafter, appellant asked him whether he had talked to the police. He said that appellant's brother was with appellant once when appellant asked Ramey about talking to the police. When the police contacted Ramey, he did not tell them anything at first. The second time he spoke with the police, Ramey told them that he had been at the car wash with appellant but that he had not seen anything. He admitted that he did not tell them the truth but stated that he was afraid that he would "end up like [the victim]." Ramey said that he never called Montez Jennings on November 16, 2008, did not visit Mr. Jennings the next day, and did not show Mr. Jennings a gun at any point. Ramey testified that he did not remember the clothing that he and appellant were wearing the day of the murder but recalled that he wore his hair in dreadlocks and that appellant wore his hair in cornrow braids. He remembered that appellant was wearing a black hairnet-like cap.

On cross-examination, Ramey testified that his mother lived on Banberry Drive and that he might have had possessions stored at her house. He denied that the 9mm bullets found at that address were his. Ramey said that he did not have a cellular telephone when he was at the car wash. When asked whether he had made any "deals" with the State, Ramey said that he had not. However, he agreed that he signed an immunity agreement with the State whereby his testimony at appellant's trial would not be used against him. Ramey testified that he burned the car for appellant because he believed that he would be "dealt with if [he] said anything or [if] [he] didn't cooperate with [appellant]." He further testified that he was not afraid of appellant because he did not do anything to make appellant mad. On re-direct examination, Ramey clarified that his charges were still pending and that he would be tried for first degree murder and especially aggravated robbery.

The State next presented information about the victim's 9-1-1 call. The custodian of records for the Nashville Emergency Communication Center testified that the center's recording of the victim's call had been purged from their system, pursuant to their standard practice, in January 2012. The victim's mother testified that she had listened to a 9-1-1 recording and identified the victim's voice on it. The 9-1-1 recording, apparently the same recording made by Detective Harris, was played for the jury.

Deputy Chief Medical Examiner Dr. Adele Lewis testified that she performed the victim's autopsy and determined that his "cause of death was a gunshot wound to the torso and multiple blunt force injuries." She specified that the bullet entered the left side of the victim's chest and exited on the right side, breaking three ribs and going through his heart, right lung, and liver. Dr. Lewis testified that the victim had many scrapes and bruises, "some bleeding in the deep soft tissues of the scalp," and "very severe pelvic fractures." Dr. Lewis explained that the victim's "bones in the front of the pelvis were broken and separated from

each other, as were both of the bones in the lower part of the back broken and separated from each other." She opined that "a great deal of force" was required to cause the pelvic fractures. Dr. Lewis described the abrasions to appellant's lower back and buttocks as "road rash." In addition, the victim had an injury to his abdomen that "might [have] been a burn." Using autopsy photographs — Exhibits 41A-H — and a photograph from the crime scene — Exhibit 7C, Dr. Lewis described the victim's various injuries to the jury. Following her testimony, the State rested its case.

Amanda Crawford testified on behalf of appellant. She said that he did not pull a gun on the victim during the party in October 2008 and that she would have been the only person close enough to see if he had. Ms. Crawford admitted that she had seen appellant with a gun during a New Year's Eve celebration, when "everybody was shooting" guns at midnight.

On cross-examination, Ms. Crawford testified that she dated the victim for "a couple [of] months" but had been in a relationship with appellant "off and on" since she was sixteen years old. Ms. Crawford agreed that when Detective Harris interviewed her on November 18, 2008, she initially told him that appellant did not pull a gun on the victim at the party but later admitted that he had done so. Ms. Crawford further agreed that she told Detective Harris that appellant "carrie[d] a gun quite often." Regarding appellant and his brother, Ms. Crawford agreed that she told Detective Harris that she had never known appellant's brother to drive appellant's vehicle nor appellant to drive his brother's vehicle without his brother also being in the vehicle.

Jonathan Eric French, appellant's brother, testified that on November 16, 2008, he went to his parents' house on Forrest Avenue to pick up the family's Trailblazer, which he said was silver, so he could clean it. He took it to Carl's Car Wash and parked it on the side. He recalled seeing a vehicle leave that still had soap on it. Jonathan French also heard gunshots, so he left the car wash and went to AutoZone to purchase a car part. However, the store did not have the part he wanted. When he tried to go back to the car wash, it had been cordoned off. Eventually, he was taken to the police precinct for questioning. He said that the police began questioning him at 3:00 or 4:00 p.m. and that the questioning lasted four to six hours. After the police took him home, he went back to the crime scene with his parents and stayed until the Trailblazer was towed. He said that he did not have his cellular telephone with him that day.

On cross-examination, Jonathan French said that he did not see how his interview could only have lasted "one hour and [fifty-seven] minutes and [thirty] seconds," which was the length alleged by the State. When asked whether it would surprise him if Detective Harris had watched the surveillance video from AutoZone and never saw him in the store, Jonathan French said, "I'm pretty sure he'd seen me if he pulled it."

-12-

Mary French, appellant's mother, testified that the police came to her house on November 16, 2008, but never told her why. While the officers were there, appellant called her. The police talked to appellant over the telephone. Mrs. French went with her husband and Jonathan French to Gallatin Pike between 5:30 and 6:00 p.m. On cross-examination, Mrs. French said that she owned houses on Forrest Avenue and Marthona Road and that her sons sometimes stayed at Marthona Road and sometimes at Forrest Avenue. She could not recall whether appellant or Jonathan French were at her house on Forrest Avenue when she awoke on November 16, 2008.

Archie French, II, appellant's brother, testified that on November 16, 2008, two police officers came to his mother's house looking for appellant. The officers learned that appellant was at a tobacco store across the street from the car wash, so Archie French met appellant at the tobacco store "a little bit before 4:30." Archie French said that he and appellant waited there until the Trailblazer was towed.

On cross-examination, Archie French said that when Jonathan French and their parents arrived, he and appellant went to get a digital camera from Archie French's house, to get batteries for the camera, and then back to his house to charge the camera when they could not find appropriate batteries. They returned to the crime scene, and he took photographs of the area. He agreed that he had never told anyone that he knew where appellant was the entire afternoon. After Archie French's testimony, the defense rested.

The State recalled Detective Harris as a rebuttal witness. He said that he had reviewed the videotaped interview with Jonathan French and found that the timestamp indicated the interview lasted one hour and fifty-seven minutes. Detective Harris stated that the videotape represented the full extent of Jonathan French's questioning. Detective Harris testified that Jonathan French told him during that interview that he had gotten in the wrong line at the auto parts store, so he left rather than wait in another line.

Detective Hafley also testified as a rebuttal witness. He said that he transported Jonathan French from the police precinct to his home and that he recorded the entire interaction. He "timestamp[ed]" the end of the recording by stating the time he dropped off Jonathan French, which was 6:12 p.m.

After the close of proof and deliberations, the jury found appellant guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. He received life sentences for the murder convictions, and the trial court sentenced him to a concurrent sentence of twenty-one years for his especially aggravated robbery conviction.

II.  Analysis

A.  Sufficiency of the Evidence

On appeal, appellant contends that the evidence was insufficient to support his convictions.  Specifically, he argues that there was no physical evidence to connect him with the crimes and that the State's witnesses were unreliable.  The State responds that the evidence was sufficient.  We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'"  *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).  Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings.  *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellant of premeditated murder. Tennessee Code Annotated section 39-13-202(a)(1) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense"; thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Appellant was also convicted of especially aggravated robbery and felony murder. For the felony murder count, the State had to establish that the victim was killed in the course of a robbery. Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon[ ] and [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401, -403.

Viewed in the light most favorable to the State, the evidence presented at trial showed that appellant, accompanied by Leangelo Ramey, drove to Carl's Car Wash on Gallatin Pike, where he stole the victim's car. He left the car wash initially, but then he returned and shot the victim. After he shot the victim, appellant ran over the victim with the victim's own car.

Appellant drove off in the car and later had Ramey drive the car away from Nashville and burn it. Multiple witnesses saw the victim's car being driven over him. Kimberly McLemore saw the victim speaking with appellant immediately before the gunshots, and she identified appellant in a photographic lineup shown to her within days of the murder. While Ramey did not actually see appellant shoot the victim, he testified that appellant was in the driver's seat of the victim's car when the victim was run over. Ramey further testified in detail about burning the victim's car at appellant's behest. Other witnesses testified about appellant's motive. Amanda Crawford testified that she had dated both men and that the men had an altercation at a party in the weeks before the victim's murder. While she denied seeing appellant with a gun the night of the party, Detective Harris testified that Ms. Crawford had admitted to him during an interview that appellant had a gun that night. In addition, Christopher Savage testified about the same altercation and seeing appellant with a gun that night.

Appellant's argument regarding the credibility of the witnesses is without merit. All witnesses were thoroughly cross-examined, and the jury assessed the testimony and evidence at trial. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379. Moreover, it was within the purview of the jury to convict appellant based on the witnesses' testimonies, despite a lack of physical evidence connecting appellant to the victim's murder. *See State v. Jeremy Stevenson*, No. W2011-02053-CCA-R3-CD, 2013 WL 587313, at *12-14 (Tenn. Crim. App. Feb. 13, 2013), *no perm. app. filed*. Appellant's shooting the victim and then running over him combined with the history between the men supports appellant's conviction for first degree premeditated murder. As the victim's car was also stolen, we conclude that the evidence was sufficient to support appellant's conviction for first degree felony murder and especially aggravated robbery. We note that the two murder convictions are alternate theories for the same offense, however, and the trial court should have merged them. *See State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). Therefore, while we conclude that the evidence was sufficient to support all three convictions, we must remand the case for the trial court to merge the two murder convictions.

## B. Waiver

Appellant has presented four issues to this court that we now deem waived for failure to include in his motion for new trial: (1) the trial court erred by admitting prior bad act testimony; (2) the trial court erred by admitting a letter purportedly written by appellant; (3) the trial court erred by admitting testimony regarding weapons found in appellant's home; (4) the assistant district attorney general committed prosecutorial misconduct during closing arguments. *See* Tenn. R. App. P. 3(e). Moreover, we conclude that plain error review is not proper because in light of the overwhelming evidence against the accused, none of the alleged

errors would have "probably changed the outcome of the trial"; thus, consideration of the alleged errors is not necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

## C. Autopsy Photographs

Appellant challenges the trial court's admission of three photographs depicting injuries of the victim (Exhibits 7C, 41F, and 41G) as unnecessarily gruesome and prejudicial. The State responds that the trial court did not abuse its discretion in admitting the photographs into evidence. We agree with the State.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949. Next, a trial court must first determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Id.* at 951 (citing *Milam v. Commonwealth, Ky.*, 275 S.W.2d 921 (1955)). "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

In this case, Dr. Lewis testified in a jury out hearing that the three photographs in question would aid her in describing the victim's injuries to the jury. In particular, during her testimony before the jury, she said that the victim had "road rash" and that one of his injuries might have been a burn. In the jury-out hearing, Dr. Lewis explained that the three photographs in question illustrated those injuries. The trial court chose a group of eight photographs in total from the autopsy photographs that it considered not to be particularly gruesome. Exhibits 41F and 41G were from this group of photographs, and Exhibit 7C was a crime scene photograph introduced during Lieutenant Frank Ragains' testimony. For all three photographs, the trial court ruled that the probative value was not substantially outweighed by the danger of unfair prejudice. After reviewing the photographs and the accompanying testimony, we conclude that the trial court did not abuse its discretion. Appellant is without relief as to this issue.

## CONCLUSION

Based on the record, the arguments of the parties, and the applicable law, we affirm the judgments of the trial court. However, we remand this case to the trial court for entry of an amended judgment noting the merger of the first degree murder convictions.

_____

ROGER A. PAGE, JUDGE

-18-